# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| COUNTY OF SHOSHONE OF THE STATE OF IDAHO; GEORGE E. STEPHENSON; NEW JERSEY MINING COMPANY, <br><br>      Plaintiffs <br><br>      vs. <br><br> UNITED STATES OF AMERICA; SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE; CHIEF OF THE UNITED STATES FOREST SERVICE; REGIONAL FORESTER OF THE NORTHERN REGION OF THE UNITED STATES FOREST SERVICE; FOREST SUPERVISOR FOR THE IDAHO PANHANDLE NATIONAL FORESTS OF THE UNITED STATES FOREST SERVICE; DISTRICT RANGER FOR THE COEUR D'ALENE RIVER RANGER DISTRICT OF THE UNITED STATES FOREST SERVICE, <br><br>      Defendants. | Case No.:  CV 09-505-REB <br><br> **MEMORANDUM DECISION AND ORDER RE:** <br><br> **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 32)** <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 36)** |

Now pending before the Court are (1) Plaintiffs' Motion for Partial Summary Judgment (Docket No. 32), and (2) Defendants' Motion for Summary Judgment (Docket No. 36).  Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  INTRODUCTION

This action speaks to a controversy rooted deep into the early history of Idaho, involving the legal status of claims to rights-of-way for the construction of roadways across federal lands.

**MEMORANDUM DECISION AND ORDER - 1**

Here, the Court is asked to decide the legal status of a mountainous passage route that dates to 1884, located in Shoshone County, Idaho, referred to by the parties as the "Eagle Creek Road."

In 1866, Congress enacted an open-ended grant of "[t]he right[-]of[-]way for the construction of highways over public lands, not reserved for public uses . . . ."  Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743. Commonly called "R.S. 2477" after its residing place in the 1866 volume of Revised Statutes, this offer of a right-of-way over unreserved federal land remained in effect for 110 years, and "most of the transportation routes of the West were established under its authority." *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740-41 (10th Cir. 2005) ("During that time, congressional policy promoted the development of the unreserved public lands and their passage into private productive hands; R.S. 2477 rights-of-way were an integral part of the congressional pro-development lands policy.").

In enacting FLPMA in 1976, Congress abandoned this approach to public lands by moving to a different policy which emphasized the retention of federal lands with an increased emphasis on conservation and preservation.  *See id*. at 741 (citing 43 U.S.C. § 1701 *et seq*.). Even though FLPMA repealed R.S. 2477, it nonetheless preserved any rights-of-way that existed before FLPMA's October 21, 1976 effective date, and any such qualifying rights-of-way remain valid today.  *See* 43 U.S.C. § 1769(a); *see also Southern Utah Wilderness Alliance*, 425 F.3d at 741 ("[FLPMA] thus had the effect of 'freezing' R.S. 2477 rights as they were in 1976.") (citing *Sierra Club v. Hodel*, 848 F.2d 1068, 1081 (10th Cir. 1988)).  No R.S. 2477 right-of-way may be established, however, once the land in question is withdrawn from the public domain or included

**MEMORANDUM DECISION AND ORDER - 2**

within a reserve. *See Adams v. United States*, 3 F.3d 1254, 1258 (9th Cir. 1993); *see also United States v. Jenks*, 804 F. Supp. 232, 235-36 (D. N.M. 1992) (roads created after Presidential proclamation reserved land as national forest were not public roads under R.S. 2477).

Still, Congress never specified a particular method or procedure for establishing R.S. 2477 rights-of-way. Indeed, "the establishment of R.S. 2477 rights[-]of[-]way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested." *Southern Utah Wilderness Alliance*, 425 F.3d at 741; *see also Report to Congress on R.S. 2477: The History and Management of R.S. 2477 Rights-of-Way Claims on Federal and Other Lands* (June 1993) (explaining that R.S. 2477 highways "were constructed without any approval from the federal government and with no documentation of the public land records, so there are few official records documenting the right-of-way or indicating that a highway was constructed on federal land under this authority."). This, coupled with the fact that parties rarely had need to wrestle with R.S. 2477 issues while the statute was still in force (especially when considering the federal government's pre-1976 policy of opening and developing public lands), can make for a difficult, well-after-the-fact, task to prove an R.S. 2477 right-of-way, sending litigants to "the historical archives for documentation of matters no one had reason to document at the time." *Southern Utah Wilderness Alliance*, 425 F.3d at 742.

This case presents such a task for Plaintiffs. Answering the question of whether Eagle Creek Road is an R.S. 2477 right-of-way requires an examination of events taking place between: (1) 1884, when the Eagle Creek Road first came into existence to help miners and merchants traverse from Montana into Coeur d'Alene gold fields, and (2) November 6, 1906,

**MEMORANDUM DECISION AND ORDER - 3**

when President Theodore Roosevelt created the Coeur d'Alene Forest Reserve and

withdrew/reserved the land upon which the Eagle Creek Road is located from the public domain

(*see* Defs.' Ex. 77 (President Roosevelt's proclamation reserving lands that became the Coeur

d'Alene Forest Reserve)). *See e.g.*, *Adams*, 3 F.3d at 1258 ("To establish a[n] [R.S. 2477 right-

of-way], the Adamses must show that the road in question was built before the surrounding land

lost its public character in 1906.") (citing *Humboldt Cnty. v. United States*, 684 F.2d 1276, 1281

(9th Cir. 1982)).

 Not surprisingly, given the length of time since the events underlying this lawsuit, there

is no direct testimony about the history of the road.  All of the evidence is drawn from the

historical record – from contemporaneous but still extant written accounts of the creation and use

of the route, or from government records touching upon the mining claims in the vicinity, or

from the records of other governmental activities relating to the ongoing business of the vicinity.

There are maps of many forms, newspaper articles from the gold rush maelstrom of the time,

records of patented and unpatented mining claims, and historical accounts authored at different

times over the last century by local historians or government agencies.  The record is an

enormous patchwork of such evidence, with interlocking pieces in some instances, and missing

parts in other instances.

 The Court has scrutinized, considered, and weighed each of the hundreds of documents in

the record.  The Court has carefully read the parties' respective historical narratives, offered

through the reports or declarations of those employed to trace the history of the road.  The

parties' briefing, which places the historical record upon the legal template of R.S. 2477 and

applicable Idaho law, was a great aid to the Court, and has been pondered at length.

**MEMORANDUM DECISION AND ORDER - 4**

## II. **GENERAL BACKGROUND**

Plaintiffs Shoshone County, George Stephenson, and New Jersey Mining Company (collectively "Plaintiffs") bring this action against, among many others, Defendant U.S. Forest Service (collectively "Defendants"), seeking to re-open Eagle Creek Road to public access. *See* Pls.' Compl. (Docket No. 1) (asserting four, interrelated, claims for relief). Despite the underlying dispute, the parties generally agree upon many of the historical facts giving rise to Eagle Creek Road and, thus, the foundation for the Court's consideration of the parties' cross motions for summary judgment.

In 1883, in the quintessential rush following the discovery of gold near Prichard Creek (a tributary to the North Fork of the Coeur d'Alene River), the mining camp of Eagle City was thrown down in the area where Eagle Creek joins Prichard Creek. The location was near the first placer claims, and took advantage of one of the few "flats" found in the otherwise heavily timbered and steep countryside. Much of the "rush" to Eagle City took place in the Fall and Winter of 1883, and on into the early months of 1884, when entrepreneurs in Belknap, Montana (located on the Northern Pacific Railroad's main line) sought ways to take a merchant's profit from the eager gold seekers headed for the Eagle Creek district. These businessmen immediately set about trying to build the most direct route the topography would allow between Belknap and Eagle City (crossing over the summits of the Bitterroot Mountains that divided the Montana Territory and the Idaho Territory) and then promoted the "Belknap Trail" route to new arrivers even as it was just being established, as the shortest route to the gold claims. The parties disagree as to the exact form of Eagle Creek Road in those early years, but they do agree that

**MEMORANDUM DECISION AND ORDER - 5**

whatever form it did take, it existed over some part of the Belknap Trail.[1]  *See* Pls.' SOF, p. 2,

¶¶ 5 (Docket No. 32, Att. 2); *see also* Defs.' SOF, p. 1, ¶¶ 1-2 (Docket No. 37); Pls.' Resp. to

SOF, pp. 1-2, ¶¶ 1-2 (Docket No. 50, Att. 1).

By the Spring of 1885, however, nearby Murray, Idaho supplanted Eagle City as the

center of mining activity in the area.  *See* Defs.' SOF, p. 1, ¶ 3 (Docket No. 37); *see also* Pls.'

Resp. to SOF, p. 2, ¶ 3 (Docket No. 50, Att. 1).  As a result, other routes, more direct to Murray,

began connecting the Northern Pacific Railroad in Montana and the Coeur d'Alene gold fields.

One was the "New Belknap Trail," which altogether avoided Eagle Creek Road and Eagle City,

shortening the distance between Belknap and Murray by approximately six miles.  *See* Defs.'

SOF, pp. 1-2, ¶ 4 (Docket No. 37); *see also* Pls.' Resp. to SOF, pp. 2-3, ¶ 4 (Docket No. 50, Att.

1).

Despite agreement about some historical facts, the parties differ in their respective

characterizations of Eagle Creek Road's importance, use, and maintenance over time.  That

disagreement is a central fulcrum of this lawsuit, and one which the Court must resolve in order

to decide the pending motions.

For example, notwithstanding the ascension of Murray over Eagle City, coupled with the

emergence of the New Belknap Trail, Plaintiffs contend that activity along Eagle Creek Road

---

[1]  Additionally, although not necessarily integral to this Decision, there is some disagreement whether the Belknap Trail (or at least, what later came to be called the "Old Belknap Trail") and Eagle Creek Road are one-and-the-same.  On the one hand, Fred W. Brackebusch identifies Eagle Creek Road as "[t]he western portion of the Belknap Trail" whereas Defendants' expert, James Muhn suggests that the Belknap Trail "became the Eagle Creek Route."  *See* Brackebusch Decl., p. 7, ¶ 28 (Docket No. 32, Att. 3); *see also* Muhn Report, p. 8, attached to Muhn Decl. (Docket No. 38).  It would seem that Eagle Creek Road for the purposes of the instant dispute is merely a part of the Belknap Trail; regardless, any technical difference in Eagle Creek Road's description vis à vis the Belknap Trail is inconsequential for the purposes of addressing the parties' cross-motions for summary judgment here.

**MEMORANDUM DECISION AND ORDER - 6**

"did not materially change" as evidenced by the mining records, government declarations in

county commission records, voting records, and purported county maintenance of the road:

- Petitions from residents of Ellensburg, Idaho (located in the Eagle Creek drainages upstream from the town) in March and April of 1885 to the Shoshone County Board of Commissioners requested the declaration of a county road from Ellensburg to Eagle City.  Plaintiffs contend such a declaration must have been made, even though there is no record of such, because the Commissioners, on July 13, 1885, did enact a declaration of county road between the "Ellensburg to Eagle Road" and Doctorville, Idaho (another mining camp in the Eagle Creek drainage), demonstrating that the petition for the Ellensburg to Eagle Road was granted, but inadvertently omitted from the Shoshone County Commissioners Minutes.  *See* Pls.' SOF, pp. 4-6, ¶¶ 13-14 & 18-20 (Docket No. 32, Att. 2);  *see also* Pls.' Resp. to SOF, p. 3, ¶ 5 (Docket No. 50, Att. 1).

- A number of government mineral surveys between 1887-1888 reference "a good wagon road" and "a good trail" attributable to Eagle Creek Road.  *See* Pls.' SOF, p. 4, ¶ 15 (Docket No. 32, Att. 2).

- Several maps printed between 1891-1904 identify the Belknap Trail and the Eagle Creek Road.  *See* Pls.' SOF, p. 5, ¶ 16 (Docket No. 32, Att. 2);  *see also* Pls.' Resp. to SOF, p. 3, ¶ 6 (Docket No. 50, Att. 1).

- The April 10, 1906 Shoshone County Commissioners Minutes report a petition from citizens requesting "the appropriation of funds to assist in the improvement of the wagon road now extending from the old Town of Eagle to the confluence of the East and West Forks of Eagle Creek to the placer camp of Smith & Dunlap, and for the establishment of a new road from the camp of Smith & Dunlap to the mouth of Tributary Creek."  *See* Pls.' SOF, p. 5, ¶ 17 (Docket No. 32, Att. 2); *see also* Pls.' Resp. to SOF, p. 4, ¶ 8 (Docket No. 50, Att. 1).[2]

- In the 1884-1885 Legislative Session, Idaho's Territorial Legislature passed *An Act to Amend an Act Regulating Roads, Highways and Public Thoroughfares in Idaho Territory* – requiring that counties create road districts, appoint supervisors of roads to run the road districts, and assess taxes, spend money, and engage labor to maintain the roads in such districts.  Consistent with this law, on January 21, 1885, the Shoshone

---

[2]  According to Fred W. Brackebusch, "[w]hile this petition was 'examined and tabled' by the Commission according to these Minutes, these Minutes explicitly document the existence of the Eagle Creek Road, at least to the placer camp of Smith & Dunlap."  *See* First Brackebusch Decl., p. 27, ¶ 110 (Docket No. 32, Att. 3) (internal citation omitted).  Such a statement could be drawn by inference; however, there is no such "explicit" statement in the Commissioner's minutes.

**MEMORANDUM DECISION AND ORDER - 7**

County Commissioners established District No. 2, which included Eagle Creek Road. Nearly a month later, however, the Shoshone County Commissioners created a new Road District – District No. 6 – which included most of the Eagle Creek drainage; the only known road within District No. 6 was Eagle Creek Road. Thereafter District No. 6 merged into District No. 2 and, between 1885-1906, taxes were collected and expenditures were made for roads within that District. *See* Pls.' SOF, pp. 6-7, ¶¶ 21-28 (Docket No. 32, Att. 2).

• Along with unpatented mining claims, several patented mineral claims were granted within the East Fork of Eagle Creek drainage before 1906, upon which these claims relied upon the Eagle Creek Road for access. *See* Pls.' SOF, p. 8, ¶¶ 30-31 (Docket No. 32, Att. 2); *see also* Pls.' Resp. to SOF, pp. 2-4, ¶¶ 3 & 7 (Docket No. 50, Att. 1).

In stark contrast, Defendants assert that, nearly as quick as the Eagle Creek Road portion of the Belknap Trail came into existence, miners and the new fortune seekers abandoned Eagle City for Murray (the minerals in the area having either played out, already been claimed, or having proved too difficult to mine profitably). According to Defendants, Eagle Creek Road was no longer needed and, thus, no longer regularly used as a thoroughfare connecting the railroad to the area, commenting:

• By May of 1885, Eagle city was almost entirely deserted and the center of mining activity in the area shifted to the small town of Murray, Idaho. With the rapid demise of Eagle City, there is no indication that additional work occurred on the Eagle Creek route until after the 1906 Forest reservation. *See* Defs.' SOF, p. 1, ¶ 3 (Docket No. 37).

• Also in 1885, a few miners at the Ellensburg mining camp sought to complete the Eagle Creek route. Realizing that business interests in Belknap and Eagle City had no incentive to either maintain or complete the route, they petitioned Shoshone County "for a road from Eagle" to the camp. The County asked for a second petition, which the residents presented, but the historical record contains no direct evidence that the County ever approved the petition. The Ellensburg camp disappeared by 1888. *See* Defs.' SOF, p. 2, ¶ 5 (Docket No. 37).

• The Eagle Creek route slipped into obscurity. Several maps of the region in the 1890's and early 1900's contain no mention of the route at all, suggesting that any then-contemporaneous reference to the same reflected only the occasional miner in the area. The general inaccessibility of the area, with a paucity of level ground, poor soils, and a short growing season kept settlers, loggers, and ranchers away. Travel up the route was a "slow and painstaking effort," with high water crossings that made travel "quite difficult and

**MEMORANDUM DECISION AND ORDER - 8**

dangerous." Horse travel was often impossible and there are no accounts of travel by wagon. Much of the route was in the creek itself. *See* Defs.' SOF, p. 2, ¶ 6 (Docket No. 37).

• Mining activity, though present as of 1885, was extremely limited. For example, in 1904, there were only seven mining claims reported within the East Fork of the Eagle Creek drainage, with only one placer operation known to have been working during the period in question. As late as 1912, only a "few miners" lived in or near the area. *See* Defs.' SOF, pp. 2-3, ¶ 7 (Docket No. 37).

• In 1906, several attempts were made to obtain public funding for the Eagle Creek route but they were unsuccessful. Two petitions were submitted to Shoshone County to "assist" with "improvement" and "betterment" of the route and to "establish" or "create" a road to the mouth of Tributary Creek. Both were explicitly "tabled" and rejected by the County. At about the same time, the Idaho Intermountain Wagon Road Commission considered a petition for the construction of a road from the Dunlap and Smith placer camp to Jack Waite Forks. The Commission rejected this petition because the proposal "seemed to be largely for the benefit of one mine." *See* Defs.' SOF, p. 3, ¶ 8 (Docket No. 37).

Armed with their own version of the historical facts surrounding this action, both parties move for summary judgment concerning the legal status of Eagle Creek Road as contemplated by R.S. 2477 and the case law interpreting its application to situations like this.

For their part, Plaintiffs argue that Eagle Creek Road constitutes an R.S. 2477 right-of-way as a matter of law because, during the relevant time period, it represented a "highway" under Idaho law due to its (1) regular public use over the requisite period of time, (2) declaration as a "county road" by Shoshone County, and (3) maintenance by Shoshone County at the public's expense. *See* Pls.' Mem. in Supp. of Mot. for Partial Summ. J. ("Pls.' MSJ"), pp. 1, 10-17 (Docket No. 32, Att. 1). Alternatively, Plaintiffs argue that, in response to the Shoshone County Board of Commissioners' relatively recent validation of Eagle Creek Road as a public right-of-way, Defendants never sought judicial review of that decision under Idaho law and are therefore barred from now objecting to Plaintiffs' attempt at establishing Eagle Creek Road as an R.S. 2477 right-of-way. *See id.* at pp. 1, 17-20.

**MEMORANDUM DECISION AND ORDER - 9**

Defendants not only dispute Plaintiffs' arguments, but affirmatively seek an opposite ruling – namely, that Eagle Creek Road is not an R.S. 2477 right-of-way as a matter of law.  *See* Defs.' Mem. in Supp. of Mot. for Summ. J./Opp. to Pls.' MSJ ("Defs.' MSJ), pp. 13, 23-38 (Docket No. 40).  Defendants also raise procedural arguments that preliminarily (1) challenge Plaintiffs George E. Stephenson's and New Jersey Mining Company's standing to pursue this action, and (2) contend Plaintiffs' claims are altogether time-barred.  (*See id.* at pp. 13-23).

The Court heard oral argument on the parties' cross motions for summary judgment in the federal courthouse in Coeur d'Alene, Idaho.  The following day, the Court, the parties, their representatives, and the parties' counsel participated in a site inspection of Eagle Creek Road.  Pursuant to the agreement of all parties, the site inspection involved an auto-tour of the portions of Eagle Creek Road open to automobile travel, followed by foot travel over the portion of Eagle Creek Road that is not open to automobile travel.  The particular sections of Eagle Creek Road so traveled are identified as different sections in the map exhibits and briefing submitted by the parties in conjunction with the pending motions.[3]

Following the site inspection, the Court permitted the parties to file a written follow-up, giving each party an opportunity to connect their written and oral arguments as to the pending motions with the observations made during the site inspection.  Those written follow-ups have since been submitted to the Court (*see* Docket Nos. 63-66), along with several notices of supplemental authority (*see* Docket Nos. 67, 68, 70, 72-73, & 79-80).  Therefore, this Memorandum Decision and Order resolves the issues presented by the parties' briefing to date.

---

[3]  During the site inspection, the Court allowed the parties to comment upon landscape features that related to particular arguments made by the parties in their written materials and/or during the September 20, 2011 oral argument.  The parties understood, and agreed in advance, that there would be no verbatim record maintained of anything that was said during the site inspection.

**MEMORANDUM DECISION AND ORDER - 10**

## III.  <u>STANDARD OF LAW</u>

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool [ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.

The evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party and the Court must not make credibility findings.  *See id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or

**MEMORANDUM DECISION AND ORDER - 11**

deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor.  *See id*. at 256-57.  The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.  *Celotex*, 477 U.S. at 324.

As a general rule, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).  An exception to this rule exists when cross-motions for summary judgment are filed.  In that case, the Court must independently search the record for issues of fact.  *See Fair Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

In cases such as this, contemporaneous direct evidence is hard to come by and is, not surprisingly, largely absent from this record.  What remains – circumstantial evidence – is appropriately considered, but in order to support a party's argument, such evidence must be more than mere conclusions, and the strength of such evidence turns upon the strength of the inferences to be drawn from the evidence, particularly when measured against the larger context of all of the historical record.

**MEMORANDUM DECISION AND ORDER - 12**

# IV.  DISCUSSION

**A.     The Quiet Title Act and the Non-Governmental Plaintiffs' Standing**

As a limited waiver of sovereign immunity, the Quiet Title Act is the sole avenue by which Plaintiffs can prove the existence of its R.S. 2477 rights in court. *See Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983) (holding that Quiet Title act is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property."). Under the Quiet Title Act, the United States may be named as a party defendant in a civil action to adjudicate a disputed title to real property in which the United States claims an interest. *See* 28 U.S.C. § 2409a(a). However, the Quiet Title Act sets forth heightened pleading requirements: a plaintiff asserting a claim under the Quiet Title Act must "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." *See* 28 U.S.C. § 2409a(d).

Defendants concede Plaintiff Shoshone County's standing to pursue this action. However, Defendants argue that the non-governmental Plaintiffs – George E. Stephenson and the New Jersey Mining Company[4] – have no recognized interest in title to the alleged right-of-way (Eagle Creek Road) and therefore lack standing to bring a quiet title suit against the United States. *See* Defs.' MSJ, p. 14 (Docket No. 40). Plaintiffs contend that these two Plaintiffs maintain the requisite right and interest in Eagle Creek Road because, as Shoshone County

---

[4] Plaintiff George E. Stephenson owns private land upon and adjacent to Eagle Creek Road. *See* Pls.' Compl., ¶ 11 (Docket No. 1). Similarly, Plaintiff New Jersey Mining Company owns mining claims near or adjacent to Eagle Creek Road. *See id*. at ¶ 12. Both Plaintiffs allege that the use of and access to these lands and claims is dependent upon Eagle Creek Road. *See id*. at ¶¶ 11-12.

**MEMORANDUM DECISION AND ORDER - 13**

residents and property holders, Idaho law permits them to petition the county to initiate public

proceedings to validate a highway or public right-of-way (or, as the case may be, challenge any

validation).  *See* Pls.' Resp. to Defs.' MSJ and Reply, pp. 28-30 (Docket No. 49) (citing I.C. §§

40-203A(1) & (4)) (". . . under Idaho laws, members of the public who have specialized and

unique interests in the right-of-way should be able to bring suit to protect their rights when the

federal government seeks to infringe on those rights.").

Unquestionably, these non-governmental Plaintiffs have *some* interest in seeking a re-

opened Eagle Creek Road.  Still, those interests – however they may be defined – are shared by

the public at large (at least insofar as the public consists of *"any* resident or property holder" in

Shoshone County, as expressed within Idaho Code section 40-203(A)).[5]  "Courts which have

addressed whether a plaintiff, as a member of the public, can assert a title under the Quiet Title

Act for access to routes established pursuant to R.S. 2477 have ruled that there is no subject

matter jurisdiction."  *Friends of Panamint Valley v. Kempthorne*, 499 F. Supp. 2d 1165 (E.D.

Cal. 2007).  In other words, the right to use a public road is not itself a right or interest in

property as recognized by the Quiet Title Act.  *See Public Lands for the People, Inc. v. U.S.*

*Dept. of Agriculture*, 733 F. Supp. 2d 1172, 1193 (E.D. Cal. 2010).  "Th[at] interest...must be

some interest in the title to the property."  *Kinscherff v. United States*, 586 F.2d 159, 160 (10th

Cir. 1978).

Here, the two non-governmental Plaintiffs have an interest in the use of Eagle Creek

Road that is shared by the public as a whole.  *See id.*  ("Members of the public as such do not

---

[5]  In this respect, within their Complaint, Plaintiffs pray that this Court "quiet title,
declare, adjudge, or decree that the Plaintiffs, *as well as the public*, have the right to use [Eagle
Creek Road] . . . ."  *See* Pls.' Compl., ¶ 120(4) (Docket No. 1) (emphasis added).

**MEMORANDUM DECISION AND ORDER - 14**

have "title" in public roads.  To hold otherwise would signify some degree of ownership as an easement.  It is apparent that a member of the public cannot assert such an ownership in a public road.").  The interest in the title to Eagle Creek Road, however, vests in the public generally or potentially, in this case, Plaintiff Shoshone County.  *See Long v. Area Manager, Bureau of Reclamation*, 236 F.3d 910, 915 (8th Cir. 2001) (". . . the right of an individual to use a public road is not a right or interest in property for purposes of the Quiet Title Act.  The proper plaintiff to challenge the condemnation of a public road is the governmental entity that owns the easement.").[6]

Therefore, even though both non-governmental Plaintiffs claim an interest (albeit not a real property interest) in the use of Eagle Creek Road, the United States has not waived its sovereign immunity in a way that permits these Plaintiffs to seek to vindicate such interests.  Without the necessary property interest in Eagle Creek Road, Plaintiffs George E. Stephenson and the New Jersey Mining Company have no standing to bring a quiet title suit against the United States.  Defendants' Motion for Summary Judgment is granted in this respect.[7]

---

[6] While it is possible to argue that abutting landowners have more rights to access certain public roads than the public generally, any such rights do not amount to a title interest necessary to maintain an action under the Quiet Title Act.  *See Staley v. United States*, 168 F. Supp. 2d 1209, 1213 (D. Colo. 2001) ("The Court refuses Plaintiffs' invitation to blur the lines between a title interest and a right of access to a public road."); *see also Baker's Peak Landowner's Ass'n, Inc. v. United States*, 2001 WL 34360431, *4 (D. Colo. 2001) (rejecting plaintiff's argument that Quiet Title Act requires only some right, title, or interest, not a title interest).

[7] Considering Plaintiff Shoshone County's understood standing to pursue Plaintiffs' claims (and, even, Defendants' own standing along with their arguments on summary judgment), Defendants' summary judgment efforts in these respects may well be hollow, unless Shoshone County should choose to abandon the lawsuit.  *See, e.g.*, *Southern Utah Wilderness Alliance*, 425 F.3d at 744 (10th Cir. 2005) (declining to address defendant's argument that plaintiff SUWA lacked standing to challenge defendant Counties' purported rights of way because BLM, which had Article III standing, raised same claims and sought same relief as SUWA; thus, "[a] decision on SUWA's standing, therefore, would in no way avoid resolution of the relevant issues.").

**MEMORANDUM DECISION AND ORDER - 15**

**B.     The Quiet Title Act and the Statute of Limitations**

The Quiet Title Act's waiver of sovereign immunity is subject to a 12-year statute of limitations.  Pursuant to 28 U.S.C. § 2409a(g):

> Any civil action under this section . . . shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  If the statute of limitations has run on a waiver of sovereign immunity, the federal court lacks jurisdiction.  *See Block*, 461 U.S. at 292 (1983).  Because Plaintiffs instituted this action on October 5, 2009, their attempt to quiet title is barred if they knew or should have known of the United States' adverse claim by October 5, 1997.

The statutory term "should have known" imparts a test of reasonableness.  *See Middlefork Holding Co., Inc. v. United States*, 2010 WL 107380, *3 (D. Idaho 2010); *see also Fidelity Exploration and Production Co. v. United States*, 506 F.3d 1182, 1186 (9th Cir. 2007) ("Although a court 'should not construe such a time-bar provision unduly restrictively,' it must 'be careful not to interpret it in a manner that would extend the waiver beyond that which Congress intended.'") (quoting *Block*, 461 U.S. at 287).  To this end, this District Court has held that "an action accrues under the [Quiet Title Act] when the United States' actions would have alerted a reasonable landowner that the government claimed an interest in the land."  *Middle Fork*, 2010 WL 107380 at *3 (citing *Shultz v. Dept. of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989)).  The parties accept this general standard, but disagree as to whether, in the context of Defendants' conduct in addressing periodic flooding and washouts along Eagle Creek Road in the late 1990's, Plaintiffs  knew or should have known of the United States' adverse claim to

**MEMORANDUM DECISION AND ORDER - 16**

Eagle Creek Road before October 5, 1997.  *See* Defs.' MSJ, pp. 17-23 (Docket No. 40); *see also*

Pls.' Resp. to Defs.' MSJ and Reply, pp. 7-10 (Docket No. 49).

      To decide this issue, the Court draws upon the underlying factual chronology, which

contains the following pertinent details:

- In response to a series of floods that occurred throughout the Coeur d'Alene River basin from November 1995 through March 1996, the Idaho Panhandle National Forests made plans for twelve potential road rehabilitation projects, including Eagle Creek Road. Among other things, the Eagle Creek Road proposal provided for the obliteration and permanent closure of 3.85 miles of Eagle Creek Road.  *See* Defs.' MSJ, pp. 20-21 (Docket No. 40) (citing Defs.' Ex. 182 at pp. JM 2494-2504).

- On February 12, 1997, notice of these "Flood Rehabilitation" projects was listed on a "Quarterly Schedule of Proposed Actions."  *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 184 at JM 2725); *see also* Defs.' Ex. 182 at JM 2497.

- On March 21, 1997, project "scoping" letters were sent to various agencies, adjacent landowners, and individuals who expressed an interest in the rehabilitation projects. *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 182 at JM 2497).  The letters "included an overview of conditions and key concerns, and a brief description of proposed flood rehabilitation activities." Defs.' Ex. 182 at JM 2497.

- On March 22, 1997, and March 25, 1997, news articles regarding the proposed rehabilitation projects, including Eagle Creek, were published in area newspapers.  *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 184 at JM 2728 & 2730); *see also* Defs.' Ex. 182 at JM 2497.

- On April 21, 1997, the Forest Service released its Watershed Rehabilitation Environmental Assessment ("EA")  *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 184 at JM 2674). The EA outlined a "No-Action" alternative which would have kept Eagle Creek Road open. More significantly, for purposes of this lawsuit, the EA described the preferred and "Proposed Action" alternative as calling for the obliteration of 3.85 miles of Eagle Creek Road. *See* Defs.' Ex. 184 at JM 2681-2685; *see also* Pls.' Resp. to Defs.' MSJ and Reply, p. 8 (Docket No. 49); Second Brackebusch Decl. at ¶ 12 (Docket No. 51).

- On May 16, 1997, a local newspaper published an article – titled, "Forest Service Ponders Closure of Popular Road" – describing the Eagle Creek Road closure proposal. *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 184 at JM 2537 ("The U.S. Forest Service is asking for public input on its proposal to close the popular East Fork of Eagle Creek Road. . . . .  The environmental assessment was finished April 21 and

**MEMORANDUM DECISION AND ORDER - 17**

the preferred option by the Forest Service interdisciplinary team is to remove the road and provide an alternative road . . . .  'If public comment is such, this preferred option could change . . . .'")).

- On May 29, 1997, the Forest Service issued a "Decision Notice" for all of the rehabilitation projects, except for Eagle Creek.  *See* Defs.' MSJ, p. 21 (Docket No. 40) (citing Defs.' Ex. 181) ("The East Fork Eagle Creek proposal will be addressed under separate decision documentation."); *see also* Pls.' Resp. to Defs.' MSJ and Reply, p. 8 (Docket No. 49); Second Brackebusch Decl. at ¶ 13 (Docket No. 51).

- On July 23, 1997, the Forest Service issued a Supplement to the EA, focusing only upon Eagle Creek.  *See* Defs.' MSJ, pp. 21-22 (Docket No. 40) (citing Exs. 183 at JM 2512-2513 & 184 at JM 2599).  Along with the "No-Action" alternative, the Supplement to the EA identified two other alternatives, proposing to close the same segment of Eagle Creek Road.  *See id.*; *see also* Pls.' Resp. to Defs.' MSJ and Reply, p. 8 (Docket No. 49); Second Brackebusch Decl. at ¶ 14 (Docket No. 51).

- On October 7, 1997, the Forest Service issued a "Decision Notice" for the Eagle Creek Restoration Project, closing approximately four miles of the then-existing road.  *See* Defs.' MSJ, p. 22 (Docket No. 40) (citing Defs.' Ex. 178); *see also* Pls.' Resp. to Defs.' MSJ and Reply, pp. 8-9 (Docket No. 49); Second Brackebusch Decl. at ¶ 15 (Docket No. 51).

Based on such facts, Defendants argue that once the April 21, 1997 Watershed Rehabilitation Environmental Assessment was issued, "Plaintiffs knew or should have known of the Forest Service's proposal to close portions of the Eagle Creek Road . . . ." and, therefore, Plaintiffs' claims are now time-barred.  *See* Defs.' MSJ, p. 22 (Docket No. 40).  In response, Plaintiffs argue that not until the October 7, 1997 Decision Notice did any Quiet Title Act claim accrue because, until that point, Plaintiffs were never on notice that their interests in Eagle Creek Road were officially adverse to the United States' interests.  *See* Pls.' Resp. to Defs.' MSJ, pp. 8-10 (Docket No. 49).  The Court agrees with Plaintiffs.

First, both the (1) April 21, 1997 Environmental Assessment, and the (2) July 23, 1997 Supplement to the Environmental Assessment, referenced a "No-Action" alternative which, if adopted, would have maintained the status quo with respect to the East Fork of Eagle Creek and

**MEMORANDUM DECISION AND ORDER - 18**

Eagle Creek Road.  The Forest Service, pursuant to the National Environmental Policy Act ("NEPA"), was required to continue consideration of these alternatives until it made, and announced, its final decision, which did not occur until the October 7, 1997 Decision Notice.[8] Before then, Plaintiffs' interests were perhaps under a cloud, but any such threat remained inchoate.  *See* Pls.' Resp. to Defs.' MSJ and Reply, pp. 9-10 (Docket No. 49) ("In the present case, the USFS did not issue a final decision until October 7, 1997.  Therefore, the "no action" alternatives listed in the EA/SEA were still being considered by the agency, and Plaintiffs had no notice until that time.").[9]  Plaintiffs' interests in Eagle Creek Road were never formally limited or made practically ineffectual before October 7, 1997; accordingly, the Quiet Title Act's 12-year limitations period was not triggered any earlier.  *See Middle Fork*, 2010 WL 107380 at *3 ("Thus, when a plaintiff claims a non-possessory interest, an action accrues only when the government, adversely to the interests of plaintiff, denies or limits the use of the alleged easement.") (citing *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995)).

Second, and more fundamentally, Defendants' arguments would implicitly allow Plaintiffs to institute this quiet title action before a final decision was made.  Had Plaintiffs' brought their claims before October 7, 1997's Decision Notice, they likely would face a motion

---

[8]  Defendants downplay the significance of including a "No-Action" alternative within the April 21, 1997 and July 23, 1997 Environmental Assessment materials as merely a "requirement of NEPA" (*see* Defs.' MSJ, p. 21 (Docket No. 40)).  However, Defendants' argument would undermine NEPA's mandate, and imply that, from the outset of any environmental decision making process, the "No-Action" alternative represents nothing more than a pretextual veneer, subject to no legitimate review or further consideration by the agency.

[9]  Indeed, according to the Forest Service's request for comments as described in the May 16, 1997 newspaper article, the Forest Service's preferred option of obliterating portions of Eagle Creek Road was still open for consideration, depending on the public's comments to the then-existing April 21, 1997 Environmental Assessment.

**MEMORANDUM DECISION AND ORDER - 19**

from the Forest Service to dismiss in light of the absence of any final decision (which came on

October 7, 1997).  This tension ultimately cuts against Defendants' statute of limitations

argument, when:

> [a] contrary holding would lead to premature, and often unnecessary suits.  If a
> government claim to title were sufficient to trigger the running of the limitations
> period on any claim affecting use of the property, a claimant of a right of access
> would be forced to bring suit within twelve years even though the government gave
> no indication that it contested the claimant's right.  The claimant would be compelled
> to sue to protect against the possibility, however emote, that the government might
> someday restrict the claimant's access.  The statute should not be read to create such
> an undesirable result.

*Middle Fork*, 2010 WL 107380 at *3.

Here, the United States absolutely contested Plaintiffs' interest in Eagle Creek Road once

it issued its October 7, 1997 Decision Notice closing a 4-mile section of Eagle Creek Road.

Requiring Plaintiffs to assert its interests through a quiet title action before then strikes the Court

as an awkward and inefficient mechanism for resolving such disputes.  Only following the

October 7, 1997 Decision Notice, did Plaintiffs absolutely know that their interests and the

Government's interests were not aligned.

Because Plaintiffs brought this action within 12 years of October 7, 1997, their claims are

not barred by the statute of limitations.  Defendants' Motion for Summary Judgment is therefore

denied in this respect.

## C.    Eagle Creek Road and R.S. 2477

R.S. 2477 provided for "right[s][-]of[-]way for the construction of highways over public

lands, not reserved for public uses."  *See supra*.  Controversies like the one presented in this

action often arise because the establishment of these rights-of-way were completely void of any

administrative formalities – no entry, no applications, no licenses, no patents, no deeds, no

**MEMORANDUM DECISION AND ORDER - 20**

formal acts of acceptance were needed to establish an R.S. 2477 right-of way.  *See supra*; *see also Southern Utah Wilderness Alliance*, 425 F.3d at 741 & 754 ("R.S. 2477 was a standing offer of a free right[-]of[-]way over the public domain," acceptance of which occurred "without formal action by public authorities . . . .  All that is required . . . are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer.").

 "To begin with, 'federal law governs the interpretation of R.S. 2477,' but 'in determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent.'" *San Juan Cnty., Utah v. United States*, 2011 WL 2144762, *5 (D. Utah 2011) (quoting *Southern Utah Wilderness Alliance*, 425 F.3d at 768).[10]  In *Southern Utah Wilderness Alliance* and *San Juan Cnty.*, the borrowed state law was "that of the State of Utah, supplemented where appropriate by precedent from other states with similar principles of law."  *Id.*  Here, the state law to be "borrowed" is that of the State of Idaho.[11]

---

 [10]  Case law from outside the Ninth Circuit is not binding upon this Court.  However, courts within the Ninth Circuit have noted with approval the detailed approach taken by these cases from the Tenth Circuit, such that both the structure and content of their "instructional" information is particularly useful here.  *See, e.g.*, *Cnty. of Inyo v. Department of the Interior*, 2012 WL 2052121 (E.D. Cal. 2012); *Friends of Panamint Valley*, 499 F. Supp. 2d 1165.

 [11]  The Tenth Circuit identifies and explains the potential strain implicit with such an interaction between federal and state law as follows:

  There is no legislative history to R.S. 2477, and the legislative context of R.S. 2477 sheds little light.  R.S. 2477 was originally enacted as section 8 of the Act of July 26, 1866.  Congress explicitly adopted state or local law as the rule of decision for sections 1, 2, 5, and 9 of the 1866 Act; just as explicitly, Congress asserted the applicability of federal laws or regulations in sections 7, 10, and 11.  The silence of

**MEMORANDUM DECISION AND ORDER - 21**

The burden of proof to establish the existence of an R.S. 2477 right-of-way falls squarely upon the claimants who seek to enforce rights-of-way against the United States.  *See Cnty. of Inyo*, 2012 WL 2052121 at *6; *see also San Juan Cnty.*, 2011 WL 2144762 at *5 (citing *Southern Utah Wilderness Alliance*, 425 F.3d at 768).  Moreover, under federal law, "land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it."  *Id.* "[I]t has long been the law that land 'grants must be construed favorably to the government and that nothing passes but what is conveyed in clear and explicit language–inferences being resolved not against but for the government.'"  *The Wilderness Society v. Kane Cnty.*, 581 F. 3d 1198, 1220 (10th Cir. 2009) (reversed on other grounds en banc) (quoting *Caldwell v. United States*, 250 U.S. 14, 20 (1919)); *accord*, *Adams*, 3 F.3d at 1258 (9th Cir. 1993).

Hence, it is Plaintiffs' burden to prove that Eagle Creek Road was a "highway" under Idaho law prior to the land subsuming Eagle Creek Road exiting the public domain on November 6, 1906.  *See* Pls.' MSJ, p. 10 (Docket No. 32, Att. 1) ("Therefore, if a public right-of-way was established under state law before the repeal of R.S. 2477, and before reservation from the public domain, then it remains a valid right-of-way under the federal government's R.S. 2477 grant.").

**D.     Creating Roads Under Idaho Law**

Under Idaho law, a public right-of-way is established by either (1) use in compliance with road creation statutes, or (2) a positive act of acceptance by the local government.  *See Galli*

---

section 8 reflects the probable fact that Congress simply did not decide which sovereign's law should apply.

*Sierra Club v. Hodel*, 848 F.2d 1068, 1080 (10th Cir. 1988) (overruled, in part, on other grounds); *but cf.* Defs.' MSJ, pp. 25-26 (Docket No. 40) (discussing U.S. Supreme Court's case in context of Act of July 26, 1866's section 9).

**MEMORANDUM DECISION AND ORDER - 22**

*v. Idaho Cnty.*, 191 P.3d 233, 237 (Idaho 2008) (citing *Farrell v. Bd. of Comm'nr of Lemhi*

*Cnty.*, 64 P.3d 304, 310 (Idaho 2002)).[12]   Plaintiffs argue that Eagle Creek Road constitutes a

public right-of-way under Idaho law by either statutory mechanism.

As to the first method, section 850 of the [Territorial] Revised Statutes of 1887 defines

"highways" as "roads, streets or alleys, and bridges, laid out or erected by the public, or if laid

out or erected by others, dedicated or abandoned to the public." *Galli*, 191 P.3d at 238 (quoting

R.S. § 850 (1887)).[13]   Section 851 declares that all highways created by the Board of

Commissioners and that "all roads used as such for a period of five years, are highways." *Id.*

(reading sections 850 and 851 of Revised Statutes of 1887 together to mean that "[a] highway

may not be created unless it is a road, street, alley or bridge that is erected or laid out by the

public, and it is used for a period of five years.").[14]   Importantly, the use "must be regular public

_____

[12]   The Idaho Supreme Court addressed whether these two procedures are mutually exclusive.  *See Farrell*, 64 P.3d at 310 ("The *Kirk* case (*see infra*) is not explicit as to whether the second approach is independent of the state statute or if both of the two requirements for R.S. 2477 roads are reiterations of the requirements as already found in the state statute.  The difference is important since the second method requiring any 'positive act' is more lax than the requirements set forth in the state road creation statute.  Considering the language in *Kirk*, it appears that there are two separate methods and that a positive act of acceptance need not be coextensive with the road creation statute."); *see also Sopatyk v. Lemhi Cnty*, 264 P.3d 916, 921 (Idaho 2011).

[13]   Although the parties agree that Eagle Creek Road first came into existence in 1884, they both cite to the Revised Statutes of 1887 as the applicable road creation statute here, until its amendment in 1893 (*see infra*).  *See, e.g.*, Pls.' MSJ, p. 11 (Docket No. 32, Att. 1); Defs.' MSJ, pp. 29-30 (Docket No. 40); *see also* Defs.' Supp. Brief Pursuant to Court's Request for Add'l Briefing (Docket No. 72) (rejecting prospective application of 1881 Territorial statute addressed in *Sopatyk*); Pls.' Resp. to Court's Req. for Add'l Briefing (Docket No. 73) (same).

[14]   Also relevant to this action given the time period in question, in 1893, section 851 was amended to include a requirement that, in addition to five years of regular public use, the claimed road "shall have been worked and kept up at the expense of the public . . . ." *Ross v. Swearingen*, 225 P. 1021, 1022 (Idaho 1924).

**MEMORANDUM DECISION AND ORDER - 23**

use and not casual or desultory." *Id.* at 237 (citing *Kirk v. Schultz*, 119 P.2d 166, 266 (Idaho 1941)). Further, although direct evidence is not required to establish the fact of such "regular public use," "there must be sufficient circumstantial evidence to support any inferences." *Galli*, 191 P.3d at 238.[15]

As to the second method for establishing a public right-of-way under Idaho law, "there must be some positive act or acts on the part of the proper public authorities clearly manifesting an intention to accept such grant with respect to the particular highway in question." *Kirk*, 119 P.2d at 268. In *Kirk*, the Idaho Supreme Court held that such acceptance could include (1) a designation as a public highway, (2) a recording by order of the Board of County Commissioners, or (3) maintenance by public expenditure. *See id.*

Therefore, to establish an R.S. 2477 right-of-way in Eagle Creek Road, Plaintiffs must show either that (1) Eagle Creek Road represented a highway under Idaho's applicable road creation statute before the surrounding land's reservation in 1906, or (2) the appropriate public authority took an affirmative act recognizing Eagle Creek Road as a highway under Idaho law. In their third and fourth claims for relief, Plaintiffs allege that Eagle Creek Road represents an R.S. 2477 right-of way under both approaches.

---

[15] As part of their response to the Court's request for additional briefing, Plaintiffs now argue that an 1885 Territorial statute (the one repealing the 1881 Territorial statute discussed in *Sopatyk* and the subject of the Court's June 27, 2012 Request for Additional Briefing (Docket No. 71))) applies here. *See* Pls.' Resp. to Court's Req. for Add'l Briefing, pp. 4-5 (Docket No. 73). The Court disagrees. The portion of the 1885 law that Plaintiffs now seem to rely upon ("[a]ll roads and highways . . . that are now open and used as such by the public, shall be considered county roads" (*see id.* at p. 4)) operates as a qualifier to the previously-identified methods by which a county road comes into existence under the 1885 statute – not a separate, more lenient means by which a county road is understood to exist, as is arguably the case with the inapplicable 1881 Territorial statute discussed earlier. *See, e.g.*, Defs.' Resp. to Pls.' Resp. to Court's Req. for Add'l Briefing, p. 2 (Docket No. 79).

**MEMORANDUM DECISION AND ORDER - 24**

1.      Plaintiffs' Third Claim for Relief: Eagle Creek Road and Idaho's Road Creation
        Statutes

To qualify as a highway under Idaho's road creation statutes during the relevant period of time, Eagle Creek Road must have been designated as such by the Shoshone County Board of Commissioners and regularly used by the public for five years. *See Galli*, 191 P.3d at 238.  In their third claim for relief, Plaintiffs argue that Eagle Creek Road (1) was used as a public road for at least five years before 1906, and (2) was declared a county road and, therefore, a highway, by the Shoshone County Board of Commissioners.  *See* Pls.' MSJ, pp. 12-15 (Docket No. 32, Att. 1).

a.      *Eagle Creek Road was Not Regularly Used by the Public for Five Years*
        *Between 1884 and 1906*

The parties agree that Eagle Creek Road first came into existence in 1884 as miners began converging on what became Eagle City in response to the area's gold rush.  They disagree as to whether Eagle Creek Road was regularly used by the public for five years between 1884 and 1906.

Arguing this to be the case, Plaintiffs point out that (1) government mineral surveys between 1887 and 1888 refer to Eagle Creek Road (or some portion of the same) as a "good wagon road" or a "good trail"; (2) the Shoshone County Board of Commissioners designated Road Districts within Shoshone County to manage county roads, creating a Road District that included the area of Eagle Creek Road in 1885 (later modified and expanded in 1889 and 1895); and (3) in April 1906 (approximately seven months before reservation) a petition was made to the Shoshone County Board of Commissioners requesting the appropriation of funds to improve the "wagon road" then existing from Eagle City to the confluence of the East and West Forks of

**MEMORANDUM DECISION AND ORDER - 25**

Eagle Creek to Smith & Dunlap's placer camp – implicitly recognizing the existence of Eagle

Creek Road as a county road that residents wanted to be improved.  *See* Pls.' MSJ, pp. 11-12

(Docket No. 32, Att. 1).  In the Court's mind, these cited instances fall short of establishing the

requisite five years of regular public use, particularly when examining the backdrop of Eagle

City's abbreviated life span.

i.       ***Bust on the Heels of Boom – Eagle City's Short Life***

The beginning point in assessing the evidence on this issue is the same beginning point as

the Eagle Creek gold rush, and the immediate flood of activity in the region, followed by its

equally-as-rapid demise.  Many descriptions of the rise and fall of Eagle City, drawn from local

and national newspapers and periodicals, have been placed in the record.  A contemporaneous

account from *The Century Magazine*, a well-known and widely circulated magazine of its day, is

the most compelling.  In his lengthy and often prosaic article published in the October 1884

issue, Eugene V. Smalley characterized the Eagle Creek gold rush thusly:

> Of all the stampedes in old times or in recent years, the great Coeur d'Alene
> stampede of the winter and spring of 1884 was probably the most remarkable.  The
> country it invaded was less known than any other part of the Rocky Mountain chain.
> No roads traversed it; there was not even a bridle trail.  To make matters worse, the
> entire region was covered with a forest growth of cedar, pine, and fir, so dense as to
> resemble a Hindostan jungle.  "Begorra, ye'll find the trees growin'as thick as a
> bunch of matches," said an old Irish miner, whom I encountered on my way to the
> region, and he did not greatly exaggerate.  To make matters still worse, the snowfalls
> are phenomenal, and the stampede began in the dead of winter, when the snow was
> from twelve to twenty feet deep in the mountain passes.  Yet, in spite of these
> obstacles, over five thousand men made their way into the heart of the Coeur d'Alene
> Mountains during the months of January, February, and March [of 1884].

 Eugene V. Smalley, "The Coeur d'Alene Stampede." The Century Magazine XXVIII (October

1884), p. 841, attached as Defs.' Ex. 12.

**MEMORANDUM DECISION AND ORDER - 26**

Smalley's account was mirrored by other descriptions found in the early mining camp newspapers (often in the breathless terms characteristic of such publications) and even in the New York Times, which, in its June 1, 1884 edition, described the anxious waiting in the winter of 1883-1884:

> In anticipation of a great rush and prosperous times, Eagle City had been early stocked with supplies of all kinds.  It had cost 25 cents a pound to carry the freight in, for everything had to be pulled on "toboggans" over the mountains, and high prices alone could make a profit for the shippers.  The traveling in the Winter season was dangerous on account of the frequent and heavy falls of snow.  Not only Eagle City but the whole country had been stocked in the same way, and the merchants sat about waiting for the crowds who were to swarm in upon them, and buy everything at very high figures.  For a week or two at the beginning of the rush sales were made in plenty, and tremendous profits were the result, but inside of a month everything changed.  Business had come to a complete standstill, and the towns, and section throughout, became dead . . . .  When the people began to come in, mining was of course impossible because of the snow.  To locate a claim was in itself a hard matter, to say nothing of taking out gold.  I refer to placer claims only.  To hunt for quartz leads was even more impossible, for traveling on snowshoes was difficult and the leads were so covered up that though miles were traveled a hundredth part of the country could not be seen.  Those who had taken claims were living on them in little huts.  They were doing nothing, but sitting about, and were buying just enough to keep them alive...all were waiting for something to start the wheel rolling...There was not even a trail to Eagle City at the time these statements were made, though a good one is now completed into Eagle City and several hundred pack animals are going over it day by day.

Defs.' Ex. 11.

The New York Times article does not identify the trail bringing "several hundred pack animals" a day into Eagle City.  An inference could be drawn that it was the Belknap Trail, but the inference would be tempered by the fact that the Belknap Trail was only one of several routes that had sprung up to channel goods and miners across the mountains into Eagle City.  In the July 8, 1884 issue of the brand new *Idaho Sun* newspaper published in Murray, large display ads for two of the competing trails appeared side-by-side.  *See* Pls.' Ex. 11.  The Belknap Trail

**MEMORANDUM DECISION AND ORDER - 27**

advertisement promised the reader that it was "open to travel," and was the "shortest road to the mines...[with the] distance from Belknap to Eagle City 32 miles." *Id.*  It was a "Good Road for Horses and Footmen" and could be covered in "10 hours And Less on Horseback." *Id.*  Not so fast, its competitor's ad seemed to say, in trumpeting the qualities of the "Trout Creek Trail" as the "Quickest, Cheapest and Fastest Freight Line from the Northern Pacific Railroad to Eagle, Murray and all points in the Coeur d'Alene Mountains." *Id.*  Yet another of the competing trails, the "Thompson Falls" route, was described three months earlier in *The Coeur d'Alene Nugget* (another of the nascent mining camp newspapers, but published in Eagle City) as having "a forwarding line established," which "will no doubt make [it] the most feasible route to the mines." [16] *See* Pls.' Ex. 9.

Much hope and anticipation was in the air in Eagle City in the Winter and Spring of 1883-1884.  But when the snows melted away, far too little was found to satisfy such hopes and anticipation.  Smalley chronicled the scene:

> The great rush did not occur, however, until February, when the toboggan period began.  A toboggan is the long, low sled used in Canada, and until the snows melted in April last it was the only mode of transportation to the mines.  The toboggan men, wearing snow-shoes, and hauling from one to two hundred pounds on their rude sleds, could make from ten to twenty miles a day over the mountains, following the "blazing" on the trees that indicated the trial....Twenty-five cents a pound was the price for hauling freight from the railroad forty miles to the camp established in the fall at the forks of Eagle Creek, and called Eagle City.

---

[16]  Elsewhere in the same March 29, 1884 issue of the *Nugget* was a short news reference which said "T.A. Lewis . . . has about 40,000 pounds of goods within twelve or fourteen miles of Eagle City, on the Belknap route.  He left the railroad about March 1st and is at the end of the road. . . . ."  *See* Pls.' Ex. 9.  This article appears next to another news story, quoting a story from the Spokane Review, reporting upon the "grand stampede" caused by yet more gold discoveries in the Coeur d'Alenes, but predicting that "[n]o side find will effect [sic] the continued growth of Eagle City and the travel in that direction however, and if the present rush continues[,] instead of 50,000 people at Eagle City by the 1st of July as has been predicted[,] there will be 250,000."  *Id.*

**MEMORANDUM DECISION AND ORDER - 28**

* * *

When the snow went off the stampeders got to work.  A few paying placers were opened, but in most cases the bed-rock was found to be from twelve to twenty feet below the surface, and covered with deposits of gravel and bowlders [sic].  It took an enormous amount of labor to get down to it.  The "pay streak," in most diggings, is found just on top of the first stratum of rock below the soil, the particles of gold having, in the course of ages, worked down through the earth until stopped by the rock.  In the Coeur d'Alene region the miners had to work through an enormous amount of surface deposit.

* * *

"The bloom was off the boom, " as they say in Dakota, when I went to the Coeur d'Alenes in July [1884] last.  Numbers of people had learned that locating a quartz claim on a mountainside, or sitting down in the cedar woods of a gulch and imagining how much gold there may be under twenty feet of gravel, is not a short cut to wealth.  It costs a great deal of money to open a placer, and a great deal more to get gold out of quartz, and most of the stampeders had only enough to keep them in provisions for a few weeks.  They hoped to sell their claims, but no one came with capital to buy.  Very few were able to dig ditches, build sluices, and begin cleaning the bed-rock.  An exodus from the mines began in June, and continued in a straggling way all summer.  "It was not a poor man's country," said the returning adventurers, as they footed it over the mountains to the railroad.  "What could a fellow do with only a shovel, a pick, and a plug of tobacco, when it took a thousand dollars' worth of labor to get down to the pay dirt?"  All the trails were filled with processions of melancholy men, sweating and swearing under their loads of dirty blankets.  Among them were merchants who had sold out their stocks at a loss, and gamblers looking for more promising fields.  The camps were by no means deserted, however.  Only the drift-wood went out on the ebb of the tide.

* * *

Five miles below Murray is Eagle, where the stampeders harbored last winter.  Its rise and fall covered a period of only six months.  Lots, with log buildings, which sold last February for one thousand five hundred dollars, can now be bought for fifty dollars.  Yet the place occupies the only natural town site in the whole region, having an open flat of a hundred acres, where one can see a horizon of mountain-tops up at the head of Eagle Creek, and where the vision is not limited to moss-hung trees and a hand-breadth of sky.  When the quartz leads on Eagle and Pritchard[17] creeks are

---

[17]  "Pritchard" is a frequently-found misspelling of "Prichard" in many historical accounts and other references to the Prichard Creek area, and A.J. Prichard, who first discovered gold in the area.

**MEMORANDUM DECISION AND ORDER - 29**

worked, Eagle will have a new growth.  Just now its disconsolate inhabitants are eager to dispose of their huts, tents, and town lots, and their goods and whisky, at any price, and are only staying because they cannot get away . . . .

Defs.' Ex. 12.

In a different, but still closely contemporaneous, account, James L. Onderdonk, the

Controller of the Idaho Territory, described Eagle City's rise and fall in an 1885 book about the

Territory, containing "Facts and Statistics" extolling the Territory's "Mining, Farming, Stock-

Raising, Lumbering, and Other Resources and Industries" for the "Home-Seeker, Capitalist,

Prospector, and Traveler."  Onderdonk wrote:

> Eagle City is situated near the junction of Eagle and Pritchard creeks, and between the two streams .  The site is a beautiful one for a town, the two principal streets, Eagle and Pritchard, forming almost a complete angle at the foot of the mountain – Eagle street stretching up the valley of Eagle Creek to the north, and Pritchard street extending up the valley of Pritchard creek to the east.  In the early part of the year 1884, Eagle City gave promise of becoming the metropolis of the Coeur d'Alene.  Town lots were laid out and taken up for fully three fourths of a mile along each valley, and were rated very high.  Extensive improvements were rapidly made, expensive business houses were erected, and there was a general rush of business of all kinds common to a stampede mining camp.  But as the richest mines being opened were more contiguous to Murray, four miles east of Eagle, up Pritchard Creek, business began early in the season to center in that rival burg, which soon began to lead, and before midsummer had largely absorbed the business interests and trade of the Coeur d'Alene, so that Eagle City is now almost deserted.

Defs.' Ex. 19.

For this Court, the most significant import of these reports of the gold stampede of 1883-

1884 into the Coeur d'Alenes is found in what came immediately after the frenzy – *i.e.*, that the

great stampede to Eagle Creek collapsed upon itself like the banks of snow dissolving into the

spring freshet.  If the historical record had described only the prodigious amounts of supplies that

were brought into Eagle City in the Winter of 1883-1884, and the plentitude of fortune seekers

waiting for the temperatures to rise and the ground to be revealed, inferences could be

**MEMORANDUM DECISION AND ORDER - 30**

reasonably drawn that would favor the Plaintiffs' position.  The Court could reasonably assume that the Belknap Trail  inevitably must have become a regular thoroughfare for miners, and for the opportunistic merchant and saloon-keeper profiteers who followed them.  In such a setting, inferences also reasonably could be drawn that the traffic associated with a busy placer and lode mining district would continue for at least the five years of regular use required by the Idaho Territorial statutes that prescribed the creation of public highways.

But the historical record does not stop in the Winter of 1883-1884.  It continues through that spring, and into the summer, when the promise of the Eagle Creek gold rush vanished in the face of hard realities.  Competition was fierce, in limited space, for claims hemmed-in by creek beds and steep hillsides.  Those claims that were located were hardly the new El Dorado promoted by the Northern Pacific Railroad.[18]  Placer claims were disappointingly difficult to prospect and work.  Easier and richer claims were found further up Prichard Creek towards Murray, and Murray quickly replaced Eagle City as the center of the Coeur d'Alene mining universe.  Even lode claims that were located after the snow melted in the Spring and Summer of 1884 were not  surveyed until some years later.[19]

When the Belknap Trail, on whose skeleton the Plaintiffs seek to place Eagle Creek Road for purposes of meeting R.S. 2477 requirements, was first envisioned, it was intended to be a

---

[18]  The impetus for the stampede into Prichard Creek and the lickety-split creation of Eagle City during the Fall and Winter of 1883-1884 is attributed by historians to a pamphlet widely circulated by the Northern Pacific Railroad.  The pamphlet was distributed in hopes of drawing immediate and long-term patronage to the railroad.  Among other extravagant claims, the circular promised that fortunes were being made, with "rich" placer claims yielding nuggets of gold, and quartz lodes glistening with free gold, all part of a mining district surpassing "in richness and volume the most fabulous quartz and placers ever discovered."  *See* Pls.' Ex. 35.

[19]  *See, e.g.*, Pls.' Ex. 27 (Baker Lode, located May 27, 1884, surveyed October 29, 1887), Pls.' Ex. 29 (Croesus Lode, located June 20, 1884, surveyed October 5, 1888), Pls.' Ex. 30 (Lucky Boy Lode, located June 25, 1884, surveyed October 7, 1888).

**MEMORANDUM DECISION AND ORDER - 31**

thoroughfare for miners and others through and across the mountainous divide that separated the mining districts of the Coeur d'Alenes from the Northern Pacific Railroad, the Montana Territory, and points westward and eastward alike.  Promoters hoped to create the preferred and most direct route into the center of the new mining excitement, beginning at Belknap and ending in Eagle City, by the least crooked line that could be drawn across the mountains and down the Eagle Creek drainage.

If the Belknap Trail had, in fact, bloomed in that manner, Plaintiffs' case would be much stronger.  But the ambition for the Belknap Trail was never realized.  The winter route was more of a toboggan run over deep snow than a trail impressed into the landscape.  The wagon-width road across the full length of the Belknap trail, even though perceived, was never achieved. Even the advertisement that appeared in the Summer of 1884 announcing the "opening" of the trail could boast at best that it was a "Good Road" for "Horses and Footmen."  *See* Pls.' Ex. 11. It had immediate competition from the neighboring Trout Creek Trail for the ever-dissipating number of miners, and was fighting to gain a toehold even as the mining prospects further to the east near Murray brought the actual mining clamor that had just barely begun in Eagle Creek to the mining camp of Murray instead.  Even the businesspeople promoting the Belknap Trail abandoned Eagle Creek and Eagle City, choosing instead to create the most "direct route to Murray" in a "new" Belknap Trail.  There was no reason to send freight over the trail to Eagle City, and no reason to finish any work to finish or improve the trail, much less create a wagon road – at least for their purposes.  All that remained were the few hangers-on who had something left of a disappointing grubstake, or who were still looking for color from the claims nobody else seemed to want.

**MEMORANDUM DECISION AND ORDER - 32**

The record most strongly infers that the Belknap Trail was no longer a route to anything other than the same route for a few miners that had existed before it came into existence – up the creek to wherever the placer claim might be, or up the creek and up the mountain to wherever the lode claim might be found.  The route along Eagle Creek to the confluence of the West Fork and East Fork, and then on up the East Fork, following whatever was left of the Old Belknap Trail blazes, became simply the direction one took to get to his claim, one of those places that "the only reason you'll ever go there, is if you need to go there."  The real through-way traffic of miners, merchants, and travelers followed Prichard Creek downstream to the Coeur d'Alene River, and to the Jesuit Mission at Cataldo and points further to the west; or up Prichard Creek to Murray, and over the mountains on the new Belknap Trail; or over the Thompson Falls trail to the Montana Territory, for points east.  Even the telegraph line strung next to the Belknap Trail as it was being constructed had been long abandoned.[20]

Other than the publications described earlier on in this Decision, there is precious little mention of the original Belknap Trail in the historical record of the five years following the Summer of 1884, at least as it exists in what has been supplied to the Court by the parties in this case.  There are references to the trail on maps, but not in consistent fashion.  The maps memorialize the mapmakers' understanding of the existence (or claimed existence) of a trail at that particular location.  They provide nothing about the nature of the trail upon the ground, or

_____

[20]  *See* Pls.' Ex. 29 (containing surveyor's notes from October 5, 1888 survey of Croesus Lode on Lost Jack Gulch, located 1000 feet west of Belknap trail, with surveyor mentioning that claim is "approached by a good trail about 12 miles long from Murray [(no reference here to Eagle City)], the County Seat of Shoshone County, and by one about 20 miles long from Belknap. . . .  *The telegraph line between Belknap and Eagle City once passed across the claim, but is now abandoned and mostly disappeared.*" (Emphasis added)).

**MEMORANDUM DECISION AND ORDER - 33**

the nature of the use of the trail.  Some publications contain occasional mention of the mining claims in the area, but with scant detail, if any, about whether such claims are being worked, and if so, to what degree, by their owners.  There are the previously-mentioned survey records of mining claims that were located in the Summer of 1884, but not surveyed until 1888 and later. Ultimately, however, there is a dearth of significant information that would corroborate any sort of regular, non-casual, and non-desultory use of the original Belknap Trail in the years that immediately followed 1884.

Instead, the most persuasive inferences are those drawn from the *lack* of mention in the historical record.  In 1883 and 1884, the local newspapers and even national publications gave great attention to the gold stampede into the Eagle Creek district, and the burgeoning town of Eagle Creek.  In the years that followed, there is rarely a mention, other than to say that the Eagle Creek gold rush had ended nearly as quickly as it had begun, and Murray had quickly supplanted Eagle City.

This historical backdrop assists this Court in fully assessing, and ultimately dispatching, each of Plaintiffs' arguments that Eagle Creek Road experienced regular public use for at least five years.  This, combined with Idaho case law discussing similar situations, render Plaintiffs' arguments in these respects unpersuasive.

### ii.      *Plaintiffs' Argument:  Government Mineral Surveys*

The 1887 and 1888 government mineral surveys, although mentioning a "good wagon road" for a short distance upstream from what used to be Eagle City, make clear that, whatever had existed in the summer of 1884 was mostly just a trail three and four years later.  Further, the references in those surveys represent snapshots of a subjective description of access to particular

**MEMORANDUM DECISION AND ORDER - 34**

mining claims.  A description of the access to the mining claims – as (for some, but not all) a partial stretch of  "good wagon road" and in all other instances a "good trail" – does not suffice to establish as a matter of law a history of regular public use as is required under applicable law. *See, e.g.*, *Galli*, 191 P.3d at 238 ("The only documentation was the survey map and notes, which is not adequate to show regular public use for five years.").  Moreover, even if interpreted as evidence reflecting some sufficient use to create, for some portion, a "good wagon road," and on other portions, a "good trail," the inferences from such evidence are simply too thin to carry Plaintiffs' burden of proof to demonstrate a five-year-period of regular public use, particularly when measured against the other information in the historical record of that period.

> ### iii.    Plaintiffs' Argument:  Road Districts in Early Shoshone County

The Court has considered the evidence regarding the creation of road districts in Shoshone County, and the specific mention in some instances of Eagle Creek Road in the county commission records.  However, the fact that Road Districts were designated in the same area as Eagle Creek Road – without more – does not establish that Eagle Creek Road existed (in whatever undefined form to which the county commission might have been referring) during that same time and was regularly used by the public for five years or more.  To conclude otherwise would mean that every possible trail or road in existence within a particular Road District at that time (and even now in the context of R.S. 2477 rights-of-way) amounted to a highway under Idaho law.  The Court cannot make such an all-encompassing finding based strictly upon possibilities and teetering inferences.  The Court acknowledges that it must be frustrating for those seeking to assemble such proof when the actors of the historical record could not have

**MEMORANDUM DECISION AND ORDER - 35**

anticipated the issues that might arise over a century later.  But, where the quilt of that historical

record is threadbare, the Court has no authority under applicable law to patch the holes.

***iv.***     ***Plaintiffs' Argument:  April 1906 Petition for Funds***

Aside from the significant passage of time from the other referenced events that allegedly

establish Eagle Creek Road's regular public use, a 1906 petition for funds to improve portions of

Eagle Creek Road arguably does more to cut against a finding of regular public use than it does

to support one.  The Court concludes that such a petition likely reflects the needs of only a select

number of individuals that would personally benefit from a maintained Eagle Creek Road.  There

is no record indicating that such a petition was ever granted.  Simply put, if Eagle Creek Road

had been regularly used by the public since it was created (in whatever less-than-complete form)

for the nearly 20 years before this 1906 petition, then more specific evidence reflecting such use

would exist in the record.  Instead, the historical record can only be interpreted as an

unsuccessful attempt to improve Eagle Creek Road made by an owner of a mining claim.  *See,*

*e.g.*, Defs.' Exs. 32 & 33 (May 10, 1906 rejection of undated petition to Idaho Wagon Road

Commission for appropriation of funds for construction of wagon road from Smith & Dunlap on

East Fork of Eagle Creek to mouth of Tributary Creek because " . . . the construction of this road

seemed to be largely for the benefit of one mine.").  Much more is needed to satisfy Plaintiffs'

burden in these respects.[21]

With all this in mind, the Court is satisfied that, at least for some discrete period of time

in the years 1883-1884, some passageway now known as Eagle Creek Road was used by fortune

---

[21]  Further, such petitions for funds cut against any argument that Eagle Creek Road (or
portion thereof) was maintained at the public's expense in accordance with section 851's 1893
amendment (*see supra*).  That is, the very existence of these sorts of petitions belies any
inference that funds were being spent to maintain the road.

**MEMORANDUM DECISION AND ORDER - 36**

seekers traveling to Eagle City in pursuit of gold.  But the record also reflects that, despite any

initial popularity, Eagle Creek Road's use quickly diminished as other, more profitable mining

sites became known and, likewise, as more efficient routes to such destinations became

necessary.  *See, e.g.*, *Illustrated History of North Idaho Embracing Nez Perces, Idaho, Latah,*

*Kootenai and Shoshone Counties, State of Idaho*, p. 989, attached as Defs.' Ex. 8 ("Eagle City

was a magic word in the years 1883-1884.  The history of the town was that of a pioneer mining

camp; its decline was as rapid as its rise.").  The exact progression of such events is not known

with any significant degree of certainty notwithstanding both parties' impressive research efforts.

Still, what *is* known, is that Eagle Creek Road was not regularly used by the public for five years

between 1884 and 1906.[22]  That is, after apparently becoming a favorite route for those arriving

in northern Idaho from western Montana in search of fortune, Eagle Creek Road soon thereafter

became an afterthought passageway to the region as the route became increasingly difficult to

traverse[23] – still used by some to reach their claims to be sure, but not on the level or frequency

---

[22]  This finding applies equally to any application of section 851's amendment in 1893.
Further, in addressing amended section 851's additional requirement that  the claimed road "shall
have been worked and kept up at the expense of the public . . . .", the Court rejects Plaintiffs'
argument that the Shoshone County Road Districts' "collection of user taxes and assessments on
property" between 1893 and 1906 somehow proves that Eagle Creek Road was maintained at the
public's expense.  *See* Pls.' MSJ, pp. 16-17 (Docket No. 32, Att. 1).  The fact that funds were
collected by the Shoshone County Road Districts during this time – without more – does not
establish either (1) the existence of Eagle Creek Road or (2) that Eagle Creek Road was ever
actually "worked and kept up at the expense of the public."

[23]  *See, e.g.*, The Coeur d'Alene Sun, April 30, 1904 (Defs.' Ex. 54) ("Mr. Feldman says
there is lots of snow in the Camp yet, and that the many crossings of Eagle Creek are quite
difficult and dangerous. . . . .  The washouts on the Eagle road have made it difficult for the
Eagle creek people to get supplies . . . ."); The Coeur d'Alene Sun, May 25, 1907 (Defs.' Ex. 61)
("A man from Wardner . . . attempted to ride up to Camp Columbus on Monday.  As much of the
roadbed is in the channel of East Eagle Creek, and as the water rushes with great violence in
some of the places, the horse was swept off his feet and drowned.").

**MEMORANDUM DECISION AND ORDER - 37**

that previously existed in 1884.  Such is the case of countless roads and trails crisscrossing the western United States, supporting the "haphazard wanderings of prospectors or other frontier-era travelers."  *See* Bloch & McIntosh, "A View from the Front Lines: The Fate of Utah's Redrock Wilderness Under the George W. Bush Administration," 33 Golden Gate L. Rev. 473, 491-92 (Spring 2003).  Relative to Eagle Creek Road specifically, such use over time, defined in legal parlance as only "casual or desultory" (*see supra*), undercuts any argument that Eagle Creek Road was regularly used as a public road for five years at any time between 1884 and 1906.[24]

### v.    *Plaintiffs' Arguments Contrasted Against Idaho Case Law*

The Court has considered Plaintiffs' arguments in the context of Idaho case law regarding what constitutes "regular public use," as a reality check against the mostly bare cupboard of evidence of such use for the required period of time found in the record of this case. Perhaps because such cases are generally fact-dependent, the Idaho appellate decisions do not reveal an always uniform weave.  However, those cases most factually akin to the instant dispute provide further support for the Court's ruling here.

For instance, in *Kirk v. Schultz*, P.2d 266 (Idaho 1941), the Idaho Supreme Court took up the issue of whether a "public highway" existed under applicable federal and/or territorial law, depending on the at-issue trail's quantum of public use.  *See id*. at 267-68.  Though the trail was

---

[24] Although not dispositive on the matter, certain maps of the Coeur d'Alene region in the 1890s did not show an Eagle Creek Road.  *See, e.g.*, Map of the Coeur d'Alene Mining Region, Shoshone County, Idaho, 1891 (Defs.' Ex. 21); Map of the Coeur d'Alene Mining Region, Shoshone County, Idaho, 1892 (Defs.' Ex. 38); Map of the Coeur d'Alene Mining Region, Shoshone County, Idaho, 1899 (Defs.' Ex. 39); *but see* C.H. Amerine's Sectional Map of Idaho and Western Montana, 1891 (Defs.' Ex. 41) (showing what appears to be Eagle Creek Road from Belknap to Eagle City, however, according to Defendants, "was obviously compiled from outdated sources, as Eagle City, nearly a ghost town by [1891], is shown as a sizeable town." (*see* Muhn Report, p. 13, attached to Muhn Decl. (Docket No. 38))).

**MEMORANDUM DECISION AND ORDER - 38**

"well-marked, used as a stock trail, and by miners, hunters, fishermen, and persons on horseback," the Court affirmed the trial court's determination that such use, without more, was only casual and desultory and, therefore, not a public highway.  *See id*. at 267-69.

More recently, in *Galli v. Idaho Cnty.*, 191 P.3d 233 (Idaho 2008), the Idaho Supreme Court considered the trial court's reversal of the Idaho County Board of Commissioners' (the "Board") decision to grant appellant an R.S. 2477 right-of way over respondents' private property to access appellant's unpatented mining claim.  *See id*. at 235.  In upholding the trial court's finding that the Board's decision was "clearly erroneous," the Court concluded that the Board did not expressly find that appellant affirmatively proved the existence of any right-of-way for a period of five years before exiting the public domain.  *See id*. at 238.  Instead, the Court held:

> [Appellant] was required to provide evidence, direct or circumstantial, which showed the existence and regular use of the Roads dating back to 1899.  It is noted that no evidence, other than the existence of cabins and fences, spoke toward the amount of use.  The only documentation was the survey map and notes, which is not adequate to show regular public use for five years. . . . .  It cannot be said that existence of the roads in a 1902 survey supports a finding by substantial and competent evidence to infer regular use by the public from 1899 to 1904.

*See id*.  Ultimately, the Court concluded that no evidence existed to support a finding that the use of the roads in question was "public use" as opposed to a private easement during the time period necessary to establish an R.S. 2477 right-of-way.  *See id*.

Finally, in *Lattin v. Adams Cnty.*, 236 P.3d 1257 (Idaho 2010), the Idaho Supreme Court examined whether, in the context of prescription, a public road existed by virtue of the public's use for a period of five years.  *See id*. at 1263.  Upholding the trial court in answering this question in the negative, the Court held:

**MEMORANDUM DECISION AND ORDER - 39**

> [T]here is insufficient evidence as to whether there was sufficient public use of the road. This Court has repeatedly found that casual or sporadic use is not enough – the use must be regular and continuous. The County provided affidavits from three Adams County residents attesting to the fact that, for at least twenty years, local residents used Burch Lane to access the Payette National Forest for recreational or personal purposes such as hunting, berry picking, and wood gathering. There is also evidence of individual incidents when construction equipment traversed the road, such as an occasion when Idaho Power used it to build power lines in the area. Even so, nothing in the record indicates whether this activity occurred frequently or with any consistency, especially over a five-year span.

*See id.* (internal citations omitted).[25]

The factual and legal backdrops within these cases similarly reflect the type of use that likely occurred in any five-year period from 1884 until 1906 with the Eagle Creek Road. Because land grants are construed favorably to the Government (*see supra*), and because the record does not support a finding that Eagle Creek Road was regularly used by the public for five years between 1884 and 1893, Plaintiffs' Motion for Partial Summary Judgment is denied in

---

[25]  *See also Aztec Ltd., Inc. v. Creekside Inv. Co.,* 602 P.2d 64, 66 (Idaho 1979) (use of roadway by three or four homeowners, their visitors, and invitees might constitute private easement, but is insufficient to establish public use and maintenance by public for five-year period required to establish public road under Idaho law); *Roberts v. Swim*, 784 P.2d 339, 346 (Idaho 1989) (use of roadway by adjoining landowner and his predecessors to access water sources and to facilitate farming operations did not, standing alone, establish regular and customary use by public of roadway). Having said this, there are Idaho cases that can be argued to support a different result. *See Marshall v. Blair*, 946 P.2d 975, 980 (Idaho 1997) (in private prescriptive use case, held that use of roadway by "employees and farmhands of neighboring landowners, sportsmen, milkmen, various delivery people, and customers of [adjoining landowner's] upholstery business constitutes general public use."); *Cardenas v. Kurpjuweit*, 779 P.2d 414, 418 (Idaho 1989) (use of roadway in question by motorized mail carrier and adjoining landowner's laundry clientele constitutes general public use in prescriptive easement context) ; *Ada Cnty. Highway Dist. v. Total Success Inv., LLC*, 179 P.3d 323, 330 (Idaho 2008) (finding public use where number of people routinely used alley to access their businesses). Still, the facts in such cases contain a significantly greater amount of use, and use by many persons other than the landowners, who use those roadways for business purposes. Those same type of facts are not contained in the instant record.

**MEMORANDUM DECISION AND ORDER - 40**

this respect.  Correspondingly, Defendants' Motion for Summary Judgment is granted in this respect.[26]

> b.     *The Shoshone County Board of Commissioners Did Not Declare Eagle Creek Road, or any Portion Thereof, a County Road*

Plaintiffs contend that the Shoshone County Board of Commissioners formally declared Eagle Creek Road (or at least a portion of Eagle Creek Road) a county road, thus establishing it as a highway under the alternative mechanism of Idaho's 1887 road creation statute.  *See* Pls.' MSJ, pp. 12-15 (Docket No. 32, Att. 1).  Plaintiffs rely primarily upon two petitions – one on March 25, 1885, the other on April 14, 1885 – from the residents of Ellensburg, Idaho[27] to the Shoshone County Board of Commissioners, requesting a road from Eagle City to Ellensburg.  *See id.* at pp. 13-14; *see also* First Brackebusch Decl., pp. 11-13, ¶¶ 43 & 47 (Docket No. 32, Att. 3) (citing Pls.' Exs. 18 & 23).  The historical record contains no specific record of such petitions being granted.  *See* First Brackebusch Decl., p. 13, ¶ 48 (Docket No. 32, Att. 3).  However, Plaintiffs infer that the Commissioners must have granted the Ellensburg petition, even if there is no record of doing so, because, (1) on July 13, 1885, residents of Doctorville, Idaho[28] petitioned to have the trail traveled between Eagle City and Doctorville declared a

---

[26]  This finding applies regardless of whether the "preponderance of the evidence" standard (as Plaintiffs argue is the case (*see* Pls.' Resp. to Defs.' MSJ and Reply, pp. 12-14 (Docket No. 49)) or the "clear and convincing evidence" standard (as Defendants argue is the case (*see* Defs.' MSJ, pp. 10-12 (Docket No. 40)), applies.

[27]  Ellensburg, Idaho is located on the East Fork of Eagle Creek above the confluence of Tributary Creek the East Fork of Eagle Creek on land now owned by "Plaintiff" George E. Stephenson.  *See* First Brackebusch Decl., p. 12, ¶ 44 (Docket No. 32, Att. 3) (citing Pls.' Exs. 19-21 & 33).  Access to Ellensburg from Eagle City would have been via Eagle Creek Road, or at least a portion of Eagle Creek Road.  *See id.* at ¶ 45 (citing Pls.' Ex. 19).

[28]  Doctorville, Idaho is located approximately one to two miles along the West Fork of Eagle Creek with access from Eagle City via Eagle Creek Road, or at least a portion of Eagle Creek Road.  *See* First Brackebusch Decl., p. 14, ¶¶ 54-55 (Docket No. 32, Att. 3).

**MEMORANDUM DECISION AND ORDER - 41**

county road, and (2) on that same date,  the Shoshone County Board of Commissioners granted

that request, stating: "[s]aid road to run from Doctorville to where the trail intersects the

Ellensburg and Eagle [City] road about two miles above Eagle [City]."  *See* First Brackebusch

Dec., p. 14, ¶¶ 52-53 (Docket No. 32, Att. 3) (citing Pls.' Ex. 25).  According to Plaintiffs, in

granting the Doctorville residents' petition, the July 13, 1885 Shoshone County Board of

Commissioners' minutes impliedly reflect the existence of an official county road between Eagle

City and Ellensburg and, thus, the implicit Commissioner's approval of one or both of the March

25, 1885 and April 14, 1885 petitions.  The Court is not so persuaded.

While it is true that the later-in-time designation of the "trail" to Doctorville as a county

road references the road from Eagle City to Ellensburg as a sort of geographical waypoint, that

alone does not mean that the road from Eagle City to Ellensburg (or, even, from Eagle City to

the beginning of the trail to Doctorville) must have been officially designated as a county road

following the above-referenced petitions.

First, there is no specific evidence that any portion of the route between Eagle City and

Ellensburg was ever declared to be a county road.  Yet, the Shoshone County Board of

Commissioners obviously understood that such roads came into existence through formal

decision-making processes (as evidenced, for example, by the Doctorville trail's *recorded*

designation, and many others like it).

Second, a mere reference to a road in the Commission's minutes (in this case, "the

Ellensburg and Eagle [City] road about two miles above Eagle [City]" (*see supra*)), without

more, does not then transmute such a road (which indisputably existed at that time, though not

necessarily as a county road) into a county road.  *See, e.g.*, A Map of the Coeur d'Alene Region,

**MEMORANDUM DECISION AND ORDER - 42**

1884 (Defs.' Ex. 9) (already identifying a trail/route/road along East Fork of Eagle Creek well before Ellensburg residents' petitions); Map of the Coeur d'Alene Mines and Vicinity, Idaho Territory, 1884 (Defs.' Ex. 14) (same).  The fact that two earlier petitions sought to have the road from Eagle City to Ellensburg expressly declared to be a county road is inconsequential here.  If anything, that fact just as easily clips Plaintiffs' arguments when realizing that a road, route, and/or trail need not be a county road, coupled with the absence of any record approving the Ellensburg residents' petition for a county road from Eagle City to Ellensburg.

Third, and even more compelling, is the fact that the Shoshone County Board of Commissioners twice took action only a few decades later, purporting to make particular sections of the  Eagle Creek Road a county road.  *See* Defs.' MSJ, p. 38 (Docket No. 40).  For example, on July 9, 1907, the minute notes read:

> The Petition of Adam Aulbach, et al., praying that the present wagon road[29] from the Village of Eagle [City] up and along Eagle Creek and East Eagle Creek to the Smith and Dunlap placer camp be declared a county wagon road was examined and granted, and said road is hereby declared to be a county wagon road for the use and benefit of the general public.

Defs.' Ex. 76; *see also* Defs.' Ex. 79 (July 12, 1907 minute notes stating: "In the matter of the improvement of the county road on Eagle and East Eagle Creeks:  It was ordered that the Road Overseer of Road District No. 1 be, and he is hereby authorized to expend, under his immediate supervision, the sum of One Thousand Dollars for labor and necessary improvements on said road.").  Then, on October 12, 1911, the minute notes read:

> In the Matter of Public Highways, it was ordered that a wagon road already constructed and now used as such extending from a point on Eagle Creek near the

---

[29] Much like the maps published in the same era as the time of the Ellensburg residents' petitions (*see supra*), these minutes further reinforce the notion that roads – for instance, Eagle Creek Road – can exist without them also being county roads.

**MEMORANDUM DECISION AND ORDER - 43**

> mouth of Tributary Gulch, thence along said Tributary Gulch to the property of the
> Jack Waite Mining Company, be, and the same is hereby declared a public highway.

Defs.' Ex. 80; *see also* Defs.' Ex. 81 (October 23, 1911 minute notes authorizing removal of
timber and undergrowth along several "country roads," including "that portion of the Eagle
Creek county wagon road extending from a point near the Robinson Ranch at the forks of East
and West Eagle Creeks to a point on East Eagle Creek near the mouth of Tributary Creek.").[30]
Had the Shoshone County Board of Commissioners granted the Ellensburg residents' petitions in
1885, there would have been no need for the subsequent 1907 and 1911 adoptions.  Instead, the
record, as reflected by these later adoptions, operates to support Defendants' argument that Eagle
Creek Road (or any portion of Eagle Creek Road) was never declared a county road before the
forest reservation in 1906.[31]

Plaintiffs also argue, again, that the April 1906 petition made to the County Commission
for funds to improve the "wagon road" from Eagle City to Smith & Dunlap's placer camp, as
well as the fact of designated Road Districts within Shoshone County further demonstrates that
the Shoshone County Board of Commissioners designated Eagle Creek Road to be a county
road.  *See* Pls.' MSJ, pp. 14-15 (Docket No. 32, Att. 1).  For the reasons already discussed
herein, such arguments are not persuasive.

---

[30] *See* Defs.' Ex. 190 (identifying location of Belknap Trail/Eagle Creek Road, New
Belknap Trail, county road segment adopted by Shoshone County Board of Commissioners on
July 9, 1907, and county road segment adopted by Shoshone County Board of Commissioners on
October 12, 1911).

[31] Moreover, assuming that such a declaration took place in 1885 as Plaintiff contends,
and to the extent such roads still needed to be regularly used by the public for five years, there is
an insufficient showing in this record that such *regular* public use, over any five years, ever took
place.  *See supra*.

**MEMORANDUM DECISION AND ORDER - 44**

Other evidence in the record connected to that 1906 petition also illustrates the unadopted status of the Eagle Creek Road.  In 1905, the Idaho Legislature created the "Idaho Intermountain Wagon Road Commission," and issued bonds in the amount of $50,000 to be used by the Wagon Road Commission in building roads and trails "that will make the developed and undeveloped mining sections of Idaho reasonably accessible for the purpose of prospecting and mining development."  *See* "Report of the Idaho Intermountain Wagon Road Commission," attached as Defs.' Ex. 71.  At its first meeting, the Commission decided that "no State money [would] be expended for building wagon roads into the interior of Idaho, unless a like amount of money be appropriated by the Counties through which these roads pass, or by individuals to be benefitted by these roads."  *Id.*  At least two roads in Shoshone County were the subject of requests made to the Wagon Road Commission.  The first, a request made in the Spring of 1906 by the Pennsylvania Coeur d'Alene Mining Company, asked the Wagon Road Commission to pay $350.00 as one half "of the cost of the construction of a wagon road from the placer camp of Messrs. Smith & Dunlap on the East Fork of Eagle Creek in Shoshone County, Idaho to the mouth of Tributary Creek being a tributary of the said East Fork of Eagle Creek, the said road being about one and one half miles in length."  *See*  Defs.' Ex. 32.   On April 10, 1906, two petitions were presented to the Shoshone County Commission asking "for an appropriation of funds to assist in the improvement" and "for the betterment of" the road from the old town of Eagle to the Smith and Dunlap placer camp, and for "the creation of a new wagon road from the camp of Smith and Dunlap . . . to the mouth of Tributary creek.  The County Commission, on that same April 10, 1906 date, "examined and tabled" the two petitions.  *See* Defs.' Ex. 67.

Subsequently, by letter dated May 10, 1906, the Wagon Road Commission turned down the request for monies to aid in the construction of a wagon road from the Smith and Dunlap

**MEMORANDUM DECISION AND ORDER - 45**

placer camp to Tributary Creek. "This petition was not allowed for two reasons," said the Commission: "one being that at this time we could not undertake any new work that had not been planned and laid out before, and another reason was that the construction of this road seemed to be largely for the benefit of one mine." *See supra*. The Wagon Road Commission letter ended with a request that the County Commissioners be notified of the decision. *See* Defs.' Ex. 33.

The Shoshone County Commission took no further affirmative action on the two petitions that it had "examined and tabled" prior to the Wagon Road Commission's decision. The Court gleans from those facts that the County Commission intended to "wait and see" whether the Wagon Road Commission would contribute monies to pay for the new road from the Smith and Dunlap placer camp to Tributary Creek. When the Wagon Road Commission said "no," there was no further action by the County Commission and the petitions remained tabled.

This scenario is confirmed by the fact that the Wagon Road Commission *did* fund a third request for a new road in Shoshone County in the same year, with the County splitting the cost. The year-end report issued by the Wagon Road Commission described a number of different roads into mining districts around the State that were funded in part by the Wagon Road Commission. Included in that list was the "Raven-Cedar Creek Road" which ran from "Raven, a village on Pritchard [sic] Creek [located between the old townsite of Eagle City and Murray], up Granite and Cedar Creeks to the Cedar Creek Mine, in Shoshone county, a distance of 2 ½ miles." Defs.' Ex. 71. The report says:

> Contract for this road was let June 30th, 1906, to J.H. Jackson of Wallace, Idaho for $2,500, and the engineering and advertising expenses were $67.00, making a total of $2,567, *of this the County of Shoshone paid $1,290* and the State $1,267. The road was completed October 1st, 1906. . . . This road opens up a mining country of

**MEMORANDUM DECISION AND ORDER - 46**

promise, formerly served by trails only.  There are three or four good prospect along
the line of this road that promise to be mines very shortly. . . .

*Id.* (emphasis added).  In other words, for whatever reason, during the relevant time period in the

1880's, 1890's, and the first part of the 1900's, Shoshone County was not willing to either

formally declare Eagle Creek Road as a county road, or to spend money specifically upon the

road.  Even when the possible opportunity arose to share the cost of constructing even just a

short distance of wagon road to Tributary Creek, the County Commission only considered it long

enough to be told that the Wagon Road Commission would not pay half of those costs, and then

the County Commission again left the Eagle Creek Road behind.  There apparently was not even

a further consideration by the County Commission as to whether there was good reason that the

road should be improved to the Smith and Dunlap placer claim, and a real road built beyond that

point to Tributary Creek, regardless of whether the Wagon Road Commission would help with

the cost.  Likely, the Commissioners (who were even closer to the circumstances than the Wagon

Road Commissioners) also thought that any improvements or new road construction would be

"largely for the benefit of one mine."  Defs.' Ex. 33.[32]

Because land grants are construed favorably to the Government, and because the record

does not support a finding that Eagle Creek Road, or any portions thereof, was declared a county

---

[32] Plaintiffs' additional argument that Eagle Creek Road was a designated county road
before 1906 by implication drawn from a 1924 timber contract is likewise unavailing.  A
reference to Eagle Creek Road as a "county road" in a 1924 timber contract cannot speak to local
political circumstances and decisions taking place between 1884 and 1906 – it could be an
innocuous misstatement or, just as likely, a reflection of events taking place after 1906 (*see
infra*).  *See, e.g.*, *See* Pls.' Resp. to Defs.' MSJ and Reply, p. 17 (Docket No. 49) (criticizing
*Defendants'* expert's report as referencing post-1906 activities, "which are, for the most part,
irrelevant to these proceedings.").  These separate arguments, considered separately or together
as a whole, do not establish that the Shoshone County Board of Commissioners took the
necessary formal action to declare Eagle Creek Road a recognized county road between 1884
and 1906.

**MEMORANDUM DECISION AND ORDER - 47**

road by the Shoshone County Board of Commissioners before President Roosevelt's forest reservation in 1906, Plaintiffs' Motion for Partial Summary Judgment is denied in this respect. Correspondingly, Defendants' Motion for Summary Judgment is granted in this respect.[33]

      2.      <u>Plaintiffs' Fourth Claim for Relief: Eagle Creek Road and Positive Act of Acceptance by Local Government</u>

Plaintiffs additionally argue that Eagle Creek Road represents an R.S. 2477 right-of-way because it was recognized by a positive act of acceptance by the Shoshone County Commission in 2009. Fred W. Brackebusch filed a petition on May 28, 2009 requesting that the Commission "validate" Eagle Creek Road as a public road (*see* Pls.' Ex. 107). Afterwards, the Shoshone County Board of Commissioners adopted a "Resolution Asserting Validation of Right-Of-Way as an R.S. 2477" on September 15, 2009 (Pls. Ex. 114). *See* Pls.' MSJ, pp. 17-19 (Docket No. 32, Att. 1). The Commissioners adopted verbatim the report prepared by a local historian, hired by Fred W. Brackebusch, as their findings in support of the Resolution.

According to Plaintiffs, there was no challenge to the 2009 validation efforts surrounding Eagle Creek Road and, therefore, Defendants are now precluded from challenging the validity of the subsequently deemed right-of-way. *See id*. Alternatively, Plaintiffs argue that the 2009 validation was performed pursuant to Idaho state law and should be recognized accordingly. *See id*. The Court disagrees.[34]

---

   [33] This finding applies regardless of whether the "preponderance of the evidence" standard (as Plaintiffs argue is the case (*see* Pls.' Resp. to Defs.' MSJ and Reply, pp. 12-14 (Docket No. 49)) or the "clear and convincing evidence" standard (as Defendants argue is the case (*see* Defs.' MSJ, pp. 10-12 (Docket No. 40)) applies.

   [34] The Court rejects Plaintiffs' argument that Defendants failed to respond to Plaintiffs' arguments relative to their Fourth Claim for Relief. *Compare* Pls.' Resp. to Defs.' MSJ and Reply, pp. 10-12 (Docket No. 49) *with* Defs.' MSJ, p. 7, n.1 (Docket No. 40) (arguing that "Plaintiffs' argument that proceedings by the County in 2009 'validated the Eagle Creek Road' and entitles them to an R.S. 2477 right-of-way is entitled to no weight.").

**MEMORANDUM DECISION AND ORDER - 48**

"As a limited waiver of sovereign immunity, the Quiet Title Act is the sole avenue by which [Shoshone County] can seek to prove the existence of its R.S. 2477 rights in court." *The Wilderness Soc'y v. Kane County*, 581 F.3d 1198, 1219 (10th Cir. 2009); *see also Modern, Inc. v. Florida, Dept. of Transp.*, 381 F. Supp. 2d 1331, 1351 (M.D. Fla. 2004) ("The Quiet Title Act waives sovereign immunity to suits that seek 'to adjudicate a disputed title to real property in which the United States claims an interest . . . .'  This statute provides the only means by which to challenge federal ownership of real property.") (quoting 28 U.S.C. § 2409a(a)).  Adopting Plaintiffs' arguments – in essence, pointing to the Shoshone County Board of Commissioners' recent validation (notwithstanding the United States' alleged failure to object to same) – would amount to an end-run around the Quiet Title Act.  Simply put, the Court cannot ignore the Quiet Title Act in favor of state law when such state law arguably conflicts with the federal law mandates.

Here, the Quiet Title Act is the mechanism for the parties to resolve their dispute concerning whether Eagle Creek Road qualifies as an R.S. 2477 right-of-way.  As such, Plaintiffs' Motion for Partial Summary Judgment is denied in this respect.

///

///

///

///

///

///

///

**MEMORANDUM DECISION AND ORDER - 49**

## V. **ORDER**

Based upon the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiffs' Motion for Partial Summary Judgment (Docket No. 32) is DENIED; and

2.      Defendants' Motion for Summary Judgment (Docket No. 36) is GRANTED.[35]



DATED:  **November 21, 2012**

Honorable Ronald E. Bush
U. S. Magistrate Judge

---

[35]  Plaintiffs assert that, at the very least, material issues of fact exist to deny Defendants' own dispositive motion.  *See Pls.' Consolidated Reply and Resp.*, p. 2 (Docket No. 50).  The voluminous record, containing as it does great reams of facts, might in the abstract suggest that there are disputed material issues of fact.  However, the historical record "is what it is," with each party mining the record for evidence supporting their positions.  This understood and settled record (both what is there and what is not there) generates this Memorandum Decision and Order.  That is not to say that the record contains no conflicting evidence; rather, the facts supporting the ultimate decision are fixed and there is nothing that could be put before the Court in the form of any direct testimony at a hearing or trial that changes this reality.  Consistent with this understanding, as to Defendants' expert, Mr. Muhn, the Court did not consider those portions of his report or declaration opining on the ultimate issues to be decided by the Court. Such opinions are outside the proper scope of his testimony and invade the Court's responsibility to rule upon questions of law.

**MEMORANDUM DECISION AND ORDER - 50**